# 13-2730-cv

## In the
## United States Court of Appeals
## For the Second Circuit



NYKCOOL A.B.,

*Plaintiff-Appellee,*

– v. –

ECUADORIAN LINE, INC.,

*Defendant-Appellant,*

– and –

PACIFIC INTERNATIONAL SERVICES, INC., PAN AMERICAN
TRADING COMPANY, INC., FRUIT IMPORTERS AMERICAS, INC.,
PACIFIC GROUP HOLDING, INC., SOUTH PACIFIC SHIPPING CO., LTD.,
ALVARO FERNANDO NOBOA PONTON, CARLOS AGUIRRE,
CARLOS AHLSTROM, EDWARD HICKEY and ROBERT KISSINGER,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE

MAHONEY & KEANE, LLP
*Attorneys for Plaintiff-Appellee*
40 Worth Street, 10th Floor
New York, New York 10013
(212) 385-1422

## CORPORATE DISCLOSURE STATEMENT

Petitioner-Appellee, NYKCOOL A.B. ("NYKCool"), has no parent corporations, and no publicly owned company owns 10% or more of its stock.

## PRELIMINARY STATEMENT

Judge Lewis A. Kaplan of the United States District Court for the Southern District of New York issued the Order from which appeal is taken upon the Report and Recommendation of Magistrate Judge Andrew J. Peck. The Order is not officially reported.

# **TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES ................................................................... 3

JURISDICTIONAL STATEMENT ....................................................... 6

COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW ............... 7

STATEMENT OF THE CASE ............................................................... 7

COUNTER-STATEMENT OF FACTS AND PROCEDURAL HISTORY ......... 8

SUMMARY OF ARGUMENT .............................................................. 37

STANDARD OF REVIEW .................................................................. 38

ARGUMENT ................................................................................... 40

    POINT I.    THE JUDGMENT BELOW WAS EASILY
               WARRANTED ON BOTH THE FACTS AND LAW .......... 40

CONCLUSION ................................................................................. 54

CERTIFICATE OF COMPLIANCE ..................................................... 55

# TABLE OF AUTHORITIES

*Page*

*Cases:*

Anderson v. City of Bessemer City, North Carolina,
470 U.S. 564, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985) ........................................38

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986) ..................................... 39

Blair v. Infineon Technologies AG, 720 F. Supp. 2d 462 (D. Del. 2010) ...........4

Brave Bulk Transp. Ltd. v. Spot On Shipping Ltd., No. 07 Civ. 4546 (CM),
2007 U.S. Dist. LEXIS 81137, 2007 WL 3255823 (S.D.N.Y. Oct. 30, 2007) .....41

Brunswick Corp. v. Waxman, 599 F.2d 34 (2d Cir. 1979) ................................ 50

Celotex Corp. v. Catrett,
477 U.S. 317, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986) ..................................... 39

Clipper Wonslid Tankers Holding A/S v. Biodiesel Ventures, LLC,
No. 09 Civ. 9092 (RJS), 2012 WL 523541 (S.D.N.Y. Feb. 12. 2012) .............. 38

Daval Steel Prod's v. M/ Fakredine, 951 F.2d 1357 (2d Cir. 1991) .................. 41

Godwin Realty Assoc's v. CATV Enter's, Inc.,
275 A.D.2d 269, 712 N.Y.S.2d 39 (1st Dep't 2000) ........................................... 42

Hannah Bros. v. OSK Marketing & Communications, Inc.,
609 F. Supp. 2d 343 (S.D.N.Y. 2009) ................................................................44

Hawknet Ltd. V. Overseas Shipping Agencies, No. 07 Civ 5912 (NRB),
2008 U.S. Dist. LEXIS 35542 (S.D.N.Y. Apr. 29, 2008) ...................................41

Holborn Oil Trading Ltd. v. Interpetrol Bermuda Ltd.,
774 F. Supp. 840 (S.D.N.Y. 1991) ..................................................................... 42

3

Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,
513 U.S. 527, 1995 A.M.C. 913 (1995).....................................................6

JSC Foreign Economic Ass'n Technostroyoexport v. International Dev. and
Trade Serv's, Inc., 386 F. Supp. 2d 461 (S.D.N.Y. 2005) ................................. 42

Kyoei Fire & Marine Ins. Co. v. M/V Maritime Antalya,
248 F.R.D. 126 (S.D.N.Y. 2007) .......................................................... 43

Margo v. Weiss, 213 F.3d 55 (2d Cir. 2000)....................................................... 46

Norfolk S. Ry. Co. v. Kirby, 125 S. Ct. 385, 160 L. Ed. 2d 283 (2004) ................6

NYKCool A.B. v. Pacific Fruit Inc., No. 10 Civ. 3867 (LAK)(AJP),
2012 WL 1255019 (S.D.N.Y. Apr. 16, 2012) .........................................................8

NYKCool A.B. v. Pacific Int'l Serv's, No. 12 Civ. 5754 (LAK)(AJP),
2012 WL 5462611 (S.D.N.Y. Nov. 9, 2012) .........................................................8

Perma Research & Dev. Co. v. Singer, 410 F.2d 572 (2d Cir. 1969)............... 46

Prudential Ins. Co. of Am. V. Goldstein, 43 F. Supp. 767 (E.D.N.Y. 1942)..... 48

PSG Poker, LLC v. De Rosa-Grund, No. 06 Civ. 1104 (DLC),
2008 WL 190055 (S.D.N.Y. Jun. 22, 2008).......................................................... 43

SPL Shipping Ltd. v. Gujarat Chemise Ltd., No. 06 Civ. 15375 (KMK),
2007 U.S. Dist. LEXIS 18562 (S.D.N.Y. Mar. 15, 2007)................................... 44

Tide Line, Inc. v. Estrada Commodities, Inc., No. 06 Civ. 1979 (KMW),
2006 U.S. Dist. LEXIS 95870, 2007 A.M.C. 252 (S.D.N.Y. Aug. 15, 2006)... 44

Trustees of the Nat'l Elevator Indus. Pension v. Lutyk,
332 F.3d 188 (3d Cir. 2003) ................................................................ 42

U.S. Titan, Inc. v. Guangzhou Zhen Hia Shipping Co.,
241 F.3d 135 (2d Cir. 2001).................................................................38

Ullises Shipping Corp. v. FAL Shipping Co.,

415 F. Supp. 2d 318, 2006 A.M.C. 1094 (S.D.N.Y. 2006).....................................41

<u>United States v. Afram Lines (International), Inc.,</u>
No. 91 Civ. 1062, 1997 WL 423063 (S.D.N.Y. Jul. 28, 1997)......................... 38

<u>United States v. Nirenberg</u>, 772 F. Supp. 120 (E.D.N.Y. 1991) ....................... 45

<u>Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.,</u>
475 F. Supp. 2d 275 (S.D.N.Y. 2006).....................................................41

<u>Wm. Passalcqua Builders, Inc. v. Resnick Dev's S., Inc.,</u>
933 F.2d 131 (2d Cir. 1991) ............................................................ 40

<u>World Reach Shipping Ltd. v. Industrial Carriers Inc.</u>, No. 06 Civ 3756
(NRB), 2006 U.S. Dist. LEXIS 83224, (S.D.N.Y. Nov. 9, 2006)..................... 44

## *Statutes and Rules:*

9 U.S.C. § 1 ...........................................................................6

28 U.S.C. § 1291 .......................................................................6

28 U.S.C. § 1331 .......................................................................6

28 U.S.C. § 1333 .......................................................................6

Fed. R. App. P. 4 .......................................................................6

Fed. R. Civ. P. 9(h) ................................................................... 6

Fed. R. Civ. P. 52(a)(3) ............................................................ 48

Fed. R. Civ. P. 56 .................................................................... 39

# JURISDICTIONAL STATEMENT

The district court properly exercised subject matter jurisdiction over this case pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq., as well 28 U.S.C. § 1331 and 28 U.S.C. § 1333. NYKCool's claim falls under the Court's admiralty and maritime jurisdiction pursuant to Rule 9(h) of the Federal Rules of Civil Procedure, and the federal maritime law governs this action. Norfolk S. Ry. Co. v. Kirby, 125 S. Ct. 385, 160 L. Ed. 2d 283 (2004); Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 1995 A.M.C. 913 (1995).

By virtue of the district court's final order and judgment, this Court has jurisdiction over the instant appeal. 28 U.S.C. § 1291. And the appeal appears to have been filed within the time permitted by Rule 4 of the Rules of Appellate Procedure, as Notice of Appeal was filed within 30 days after receiving notice of the entry of the judgment. See, generally, Fed. R. App. P. 4; see also, A.958

## COUNTER-STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether the summary judgment threshold may be met, where all of the facts pertinent to the holding were admitted by the non-moving party's own witnesses.

2.     Whether the legal standard for assessing a corporate veil-piercing should be based on the totality of the circumstances and the balance of all factors in the analysis.

3.     Where the alleged corporate alter-egos' funds are indiscriminately exploited as part of one giant honeypot, whether an issue of fact should properly be found simply because records of the transfers were kept so that the "books would add up."

## STATEMENT OF THE CASE

Respondent-Appellant, ECUADORIAN LINE, INC. d/b/a SOUTH PACIFIC SHIPPING CO LTD. ("EL"), appeals from the district court's judgment entered on July 10, 2013 against EL on NYKCool's corporate "alter-ego" and veil-piercing claims. (A.958).

7

## COUNTER-STATEMENT OF FACTS AND PROCEDURAL HISTORY

The Court is respectfully referred to the district court's prior decisions in this and the related action, including, inter alia, their adopted Reports and Recommendations. See, NYKCool A.B. v. Pacific Fruit Inc., No. 10 Civ. 3867 (LAK)(AJP), 2012 WL 1255019 (S.D.N.Y. Apr. 16, 2012); NYKCool A.B. v. Pacific Int'l Serv's, No. 12 Civ. 5754 (LAK)(AJP), 2012 WL 5462611 (S.D.N.Y. Nov. 9, 2012).

In the related action filed under Case No. 10 Civ. 3867 (LAK) (AJP) [hereinafter "related action"], the underlying unanimous arbitration award of April 28, 2010 was confirmed and Judgment in the amount of $8,787,157 plus interest, was on or about September 7, 2011 entered in NYKCOOL's favor against PACIFIC FRUIT INC. ("Pacific Fruit") and KELSO ENTERPRISES LTD. ("Kelso"), jointly and severally. And, on or about January 16, 2013, that Judgment was then unanimously affirmed by this Court. NYKCool A.B. v. Pacific Fruit, Inc., No. 11-4246-cv, 2013 WL 163621 (2d Cir. Jan. 16, 2013) (summary order).

The Judgment in the related action remains unsatisfied. (A.25).

Post-judgment discovery went forward in the related action with respect to successorship-in-interest and corporate veil-piercing. Though the district court held that a new action needed to be commenced in order to obtain judgment over any

8

parties in addition to Pacific Fruit and Kelso, <u>NYKCool A.B. v. Pacific Fruit, Inc.</u>, No. 10 Civ. 3867 (LAK)(AJP), 2012 WL 1255019 (S.D.N.Y. Apr. 16, 2012) (Report and Recommendation), the following facts were established.

The judgment debtor Pacific Fruit was the exclusive marketer of "Bonita" bananas in North America for approximately 40 years. (A.522).

Defendants PACIFIC INTERNATIONAL SERVICES, INC. ("Pacific International"), PAN AMERICAN TRADING COMPANY, INC. ("Pan American"), FRUIT IMPORTERS AMERICAS, INC. ("Fruit Importers"), PACIFIC GROUP HOLDING, INC. ("Pacific Group"), and EL are all located in the same offices and a principal place of business of the judgment debtor, to wit: 60 Park Place, 14th Floor, Newark, New Jersey. (A.125-26; A.152-53; A.170; A.490-49).

All of the corporate defendants, including EL, also share the same officers as the judgment debtor, to wit: CARLOS AGUIRRE ("Aguirre"), President; EDWARD HICKEY ("Hickey"), Treasurer; and CARLOS AHLSTROM ("Ahlstrom"), Secretary. <u>Id.</u>

Additionally, all of the corporate defendants, including EL, share the same board of directors, Aguirre and Hickey, except Pacific Group, for which Aguirre is the sole board member. (A.117-18).

9

And all of the stock of the defendant corporations, including EL, is owned by the same holding company, Pacific Group. (A.118-121).

The defendant companies, including EL, do not hold corporate meetings. (A.494).

Indeed, Mr. Aguirre does not even know who maintains corporate records, including those of EL. Id.

Hickey admitted that, without consideration, Pacific International and Pan American received at least $2,000,000.00 of Pacific Fruit funds at or about the time the underlying award issued. (A.113-21). He further testified that another $600,000.00 or so was similarly transferred to Pacific International on or about the date the Award issued. Id.

Aguirre confirmed that, without any loan agreement, ledger entry, or wire records, upon the authorization of Hickey under direction from Ahlstrom, $2,000,000.00 of Pacific Fruit funds were transferred to Pan American in April 2010 without his authority or any recollection of having been advised of it, and at a time when Pan American had no salaried employees and was, in fact, "dormant." (A.502-06). Those funds were never returned, Aguirre testifying that the defendant companies, including EL, commonly moved money as needed against one another's debit/credit entries without any practice in place for repayment. Id.

10

Commingling of corporate funds, including those of EL, was said to be common. (A.126; A.416-17).

Moreover, at or about the time of Judge Kaplan's March 21, 2011 Order in the related action, essentially holding that the joint liability of Pacific Fruit would be confirmed if that was what the arbitrators intended, Pacific Fruit, the 2010 Federal Tax Return of which showed gross income of more than sixty million dollars, was directed to close down, and Fruit Importers was directed to assume, all of Pacific Fruit's operations. (A.519). On or about April 1, 2011, all of Pacific Fruit's business, the entire commerce of the "Bonita" brand, was transferred to Fruit Importeres, accordingly. (A.131-35; A.151; A.517-20). All of Pacific Fruit's salaried employees ceased to work for Pacific Fruit and became employees of Fruit Importers. Id. And, again, no consideration was paid to Pacific Fruit for the transfer of its business and employees to Fruit Importers. The President of Pacific Fruit testified:

> Q. . . . it's correct that the sixty million dollar a year business [of Pacific Fruit] was given to Fruit Importers for no consideration at all; is that correct?
>
> A. That's right.

(A.573-74). And so, after 40 years of being an exclusive Pacific Fruit concern, Fruit Importers became the sole North American marketer of Bonita bananas. Id.

11

And, again, the President of both Pacific Fruit and Fruit Importers testified that he does not know the reason for the transfer of all of Pacific Fruit's business to Fruit Importers. He claims to have played no role in that decision. Instead, Aguirre testified it was done at Hickey's direction pursuant to the decision of one "Bob Kissinger," without discussion with Aguirre, and even though Mr. Kissinger was not employed by any of the defendant companies and his position or authority is unknown to Mr. Aguirre. (A.142; A.517-22).

In 2011, $18,000,000.00, either not explained at all or only vaguely explained as "advances" or as intended to pay Pacific Fruit debts, was transferred to Pan American, alone a dormant company with no employees on salary. (A.437; A.445; A.549).

Indeed, the Comptroller explained that the business of Pacific Fruit was profitable, and it struck him as "odd" that the business of Pacific Fruit was closed and its funds moved to other companies. He testified he knew of no legitimate reason for those events:

> Q. Could there be any legitimate reason for this change of corporate structure and monies?
>
> A. Not to my knowledge . . .

Q. Well, if you have a company that's making lots of money and receiving lots of money and owes a lot of money and all of a sudden it's paying out all this money to a company that has nothing to do with its business and it's closing down, doesn't it strike you to (sic) as making a detriment its creditors? . . .

A. Did it strike me as odd? Yes, I questioned it and was given the answer that orders were given, instructions were passed on and that's what we had to do.

Q. Let's go back to Exhibit 1 to this deposition. Going to May . . . $1,520,734 moved in favor of PAT from Pacific Fruit?

A. That is correct.

Q. And for June, was there a net movement of funds in favor of PAT from Pacific Fruit in the amount of $195,000?

A. Yes.

Q. And in August, was there another $80,000 net movement in favor of PAT?

A. Yes.

Q. And in September, same thing but $103.000 movement in favor of PAT?

A. That is correct.

Q. And in October, $22,000?

A. That is correct . . .

13

Mr. Wilson: To recap, the account balance, is that $2,087,000 money that's owed to PF by PAT?

The witness: That's money owed to PF from PAT . . .

Q. And PAT does no business today, is that right? Has no employees?

A. Correct.

Q. And has no money in its account, is that correct?

A. That is correct.

Q. And there are no further entries in 2011 for activity between Pacific Fruit and PAT, is that correct?

A. That is correct.

Q. So the two million dollars that was owed Pacific Fruit, has that ever been repaid?

A. No, it hasn't.

Q. But it has left the account of PAT.

A. I would have to do research and look into it.

Q. You just told me that they have no money in their account and I believe Mr. Hickey told me the same thing.

A. Correct

Q. So that two million has disappeared?

A. I would have to look at the account and see where it went.

14

Q. But it wasn't paid to Pacific Fruit?

A. I would have to look.

Q. We have the accounts right here.

A. With that statement said, yes.

(A.445-46).

The identical scenario was repeated with Pacific International. By way of example, in one transaction between Pacific Fruit and Pacific International, the Comptroller, Mr. Manuel Arocho ("Arocho"), testified that $930,000.00 was debited from the books of Pacific Fruit and credited to the books of Pacific International on March 21, 2011, the date of Jude Kaplan's Order. (A.452-53). The debit was authorized by Hickey for a purpose unknown to the Comptroller. Id. But, overall, millions of dollars moved in 2011 from Pacific Fruit to Pan American for no reason known to the Bookkeeper, Ms. Gina Santoro ("Santoro"). (A.373-92).

As stated above, other funds amounting to millions of dollars were "advanced" to Pacific International and Pan American from the assets of Pacific Fruit with no documentation or explanation for said "advances" except an alleged need for funds by the receiving companies. So, within two weeks of the debit of almost one million dollars from the books of Pacific Fruit to Pacific International,

all new business of Pacific Fruit and all of its salaried employees were moved to Fruit Importers, effectively rendering Pacific Fruit an empty shell, while its decades-long business generating tens of millions of dollars of revenue was simply given for free to a new corporation, Fruit Importers.

Especially notable for the present appeal, and contrary to EL's contentions on appeal, as a matter of record, still other funds were transferred from Pacific afruit to EL, which was treated at all times no differently, to wit: as just another "sister" company among hundreds of corporate shills created by ALAVARO FERNANDO NOBOA PONTON ("Noboa"). (A.155; A.402-08; see also, A.654; A.789). Some transfers to EL were allegedly in order to satisfy debts of Pacific Fruit. Id. Others were admittedly just "advances" to companies in need of cash. Id.; see also, A.788. But there was certainly no good reason for EL to pay Pacific Fruit's debts except to assist in Noboa's efforts to maintain Pacific Fruit's "judgment-proof" status.

Millions of dollars in pure "advances" were made by Pacific Fruit to the three sister companies, Pacific International, Pan American, and EL. As Ms. Santoro explained in questioning from her counsel:

Q. . . . What do you understand an advance to be?

A. An advance is money that we give the company—that's—an advance is money that is given to the other companies to pay their bills.

Q. . . . Is advance money that is expected to necessarily be repaid?

A. Not to my knowledge, no.

Further Examination by Mr. Keane:

Q. Let me understand your understanding of advance. Is it money that is provided from company A to company B to pay bills of company A?

A. Company A to company—money from company A to company B. Let me see how I could say this. When one of the other companies is short or doesn't have money, Company A will advance them money to do whatever they have to do, pay whatever. Not necessarily is it paid back, to my knowledge, because everything is – the companies are all related. They're all intercompanied (sic) with each other.

Q. And they comingle funds and share funds as needed?

A. Yes.

(A.416-17).

The President of Pacific Fruit and all the defendant companies, including EL, testified in a like manner. Money is moved among the group of companies, referred to as "sister" companies, as needed by any:

17

Q. You don't recall being aware of it [transfer of assets from Pacific Fruit to Pan American]?

A. We have in the past transferred cash from one entity to another entity when the other entity needed funds in order to be able to satisfy their operational needs . . .

Q. Let me ask you this; is there anything untoward of (sic) taking two million dollars out of a company that owes a judgment to another company and transferring it to a company that is out of business and has no assets shortly thereafter?

A. I have no recollection of the date of the award, but monies were transferred periodically from company to company and they're appropriately recorded . . .

Q. So the business of Pan American Trading had nothing to do with the sale of Bonita Bananas; is that right?

A. That's Correct.

Q. So any advance to Pan American Trading would have been for what purposes?

A. Pan American Trading probably needed to make payments on behalf of some other company.

Q. Any of the companies you're president of?

A. Probably, yes.

Q. And so the money would flow from one company to the other as needed?

Q. Correct . . .

18

Q. Is there any loan agreement between Pacific Fruit and Pan American Trading?

A. No, there's no loan agreement.

Q. Pan American Trading, did it have any employees in April, 2010, paid employees? Salaried employees?

A. No salaried employees, to the best of my recollection.

Q. Was it doing any business as far as providing equipment to anyone?

A. I think at that time it was mostly dormant . . .

Q. So the dormant company received two million dollars of Pacific Fruit's money without any written documentation except a wire transfer for no ascertainable purpose, if it was dormant, and you think that was proper as the president of Pacific Fruit?

Mr. Wilson: Objection

A. I think nothing improper about it.

Q. Nothing improper about transferring two million dollars to a dormant company which dissipates the two million dollars without repayment of the loan? That's acceptable practice in your view as president of Pacific International, is that right?

A. All money received or expensed by Pan American Trading are appropriately recorded in the books of the company.

Q. My question is do you believe that's proper activity?

19

A. Yes, I do, they're sister companies, so I see nothing untoward of one sister company paying something of behalf of another company . . .

Q In your view, sister companies can trade money as they wish?

A. Yes.

(A.499-505).

Again, similar exchanges of debts and funds were admitted to have occurred regularly between Pacific Fruit and EL, without any "necessary" repayment of funds. (A.402-05).

And, accordingly, EL carries the fruit of whichever "sister" company is selling the "Bonita" bananas. (A.137; A.155). Thus, it seamlessly took up the same work for Fruit Importers as it had formerly performed for Pacific Fruit. Id.

After commencement of the instant action, additional discovery then took place, not only reiterating the previous information with respect to the period in question, but still further confirming the material facts to establish beyond cavil Pacific Fruit's de facto merger and alter-ego relationship with the named corporate defendants, including EL, all of which are now properly before the Court. (A.49; A.87).

20

Notably, Hickey admitted that the transfer of the Pacific Fruit's business, and the entire North American Bonita trade, was done solely to influence NYKCool's recovery, and not for any legitimate business purpose.

> Q    You are a business manager, trained accountant, right?
>
> A    Yes.
>
> Q    In the course of your training and experience do you look for business reasons to do things?
>
> A    Yes.
>
> Q    Did you look for a business reason to shut down Pacific Fruit and open up as Fruit Importers?
>
> A    There was none that I saw.

(A.601; see also, A.629 (:Q. As president of Pacific Fruit, can you think of any business reason for the cessation of business in April 2011? A. No. Q. Can you think of any reason for advancing all of its cash to a dormant company in 2011? A. No.")).

> Q    And you also transferred or advanced moneys to other companies that you served on either as a Board member or an officer of the company, isn't that true?
>
> A    Yes.
>
> Q    And isn't it true that every effort was made to see that there was no cash or other attachable assets left to Pacific Fruit?

A       As per my instructions.

Q       Who gave you those instructions?

A       Bob Kissinger.

Q       Did he tell you why?

A       He did not mention why.

Q       Is that because he didn't need to, there was only one rational reason for what was going on?

A       I believe they were trying to come to a settlement.

Q       With Cool.

A       Yes.

Q       And to enhance their negotiation position they were busy taking all the assets out of Pacific Fruit?

        MR. WILSON:  Objection.

Q       Is that right?

A       I don't believe that.  I believe they were trying to settle.

Q       What does that have to do with taking all the business and money out of Pacific Fruit?

        MR. WILSON:  Objection.

A       Because we feel -- we know how much money we -- Pacific Fruit owed and it was -- we were trying to make a settlement, trying to come to those terms.

22

Q      How much money did Pacific Fruit owe in your estimation?

A      $1.8 million.

Q      That's not the way the award went.

A      From my understanding that's why they were trying to settle and they couldn't settle.

Q      In order to assist the settlement they transferred all the business and all the revenue and all the cash out of Pacific Fruit, is that right?

        MR. WILSON:  Objection.

A      Money was transferred out, yes.

Q      And the business was shut down and given away?

A      Yes.

Q      And the purpose of that was to assist the settlement, is that what you're testifying to, or was it to make sure that Pacific Fruit didn't pay anything more than 1 point, whatever number you just said?

A      At that point in time we believed that Pacific Fruit owed 1.8 million.

(A.602).

A      That wasn't coincidence.  That was just my instructions to that – we stopped operating as Pacific Fruit.  We moved the business over.

23

Q      Right.  And the purpose you've tried to explain to me was to help settlement.

A      Yes.

Q      It wasn't a business reason that the money had to be transferred to Pan American Trading so it could do its business.  It didn't do any business up until then.

A      No.

Q      That's correct?

A      Correct.

Q      And the aid of settlement was simply to keep Cool from satisfying its judgment.

A      My opinion was that it was trying to settle the money that Pacific Fruit actually owed to NYKCool.

Q      How would transferring all the assets in the business of Pacific Fruit aid in that settlement?

A      Because -- again, these – it was trying to come to terms of what Pacific Fruit owed to NYKCool.

(A.603).

Q.     But you do make advances on a regular basis from one company to the other.

A.     Either advances or payments on account, meaning that they pay no balances.

Q. But sometimes the payment doesn't occur. For when you provided money to Pan American Trading, they have yet to pay that back to Pacific Fruit.

24

A. Correct.

Q. In paragraph 9, [Hickey Declaration] the last sentence, you say that "all transfers among the companies were for legitimate business purposes," but we discussed the transfers, at least to Pan American Trading, the only legitimate business reason would be to assist settlement of the Cool judgment.

A.   Yes.

(A.610).

Q   When the employees of Pacific Fruit were terminated on or about March 31, 2011, what did you explain to them was going on?

A   I just basically told them that we would need to shut down and move over there and, again, I probably used the term similar to trying to come to a settlement of --

Q   With Cool?

A   With Cool.

(A.612).

With respect to the innumerable transfers between the defendant companies, including EL, to shuffle away the Bonita business and assets, Hickey was similarly constrained to admit the obvious, viz. their fundamental disregard of all corporate formality and separateness.

25

Q     Is that normal business practice, in your estimation?

A     These are between sister companies. They are owned by the same company, so it can happen within the same group itself.

Q     It can happen but is it proper?

A     It depends on the entity itself. I mean, it may be proper for us, it may not for somebody else.

Q     The way you were trained as an accountant, would that be proper?

A     In outside firms maybe not.

Q     Arm's length transactions.

A     That's true, arm's length transactions.

Q     It's not correct if that's the standard?

A     If that's the standard.

(A.609).

And again, the fact that from at least April 2011 all incoming funds due Pacific Fruit were being diverted to "dormant" or other companies, including EL, is not disputed by Aguirre. (A.627) ("Q . . . All the incoming payments to Pacific Fruit were being advanced to, for example, Pan American Trading? A. I was aware of that, yes. Q. Were you consulted on that decision? A. No, I was not.").

26

Aguirre first tried to explain the transfer of all assets of Pacific Fruit as: "The --probably transfer to have a company be able to pay the --the expenses incurred by affiliated companies." <u>Id.</u> But once it was conceded Pan American really had no expenses of its own as a dormant company, the explanation shifted. He then claimed an understanding the funds were used to pay debts of Pacific Fruit. However, there was no explanation hazarded by him as to "Why some time in 2010 and 2011 was it decided to transfer monies from Pacific Fruit to a dormant company to have the dormant company pay the debts of Pacific Fruit? A. I do not know why." <u>Id.</u>

The unquestioned decision to shut down a $60,000,000.00 a year profit center and improperly transfer its assets among the defendant companies, including EL, was also admitted to have been made on the perceived direction of Noboa, through his agents outside of the defendant companies, including EL, and without any identifiable authority. By way of example, Aguirre testified:

> Q. So who was making the decision?
>
> A. I do not know who made the decision,
>
> Q. But as president, didn't you know that there was some proper authority making that decision?
> A. Mr. Hickey was informed of the decision by the person that he was reporting to.
>
> Q. Who was?

A.      Mr. Kistinger.

Q.      And did Mr. Kistinger have the authority to make that decision, in your mind?

A.      As far as we know, yes.

Q.      Who informed you?

A.      Diogenes Villacis.

Q.      And Mr. Villacis's position in 2011 was what?

A.      I do not know what his position was.

Q. So how do you know he had authority to approve Mr. Kistinger's decisions?

A.      He re – once upon a time, he received the authority to be Mr. Kistinger's boss.

Q.      Okay. And when did he receive that authority?

A.      I don't know when and where.

Q.      Well, wouldn't you need to know that in order to be able to assess Mr. Villacis's authority?

A.      Wee, Mr. Villacis had the authority over the affairs of a lot of companies for many years.

Q.      And what do you base that answer on?

A.      On directions that we have received from Mr. Noboa.

Q.      Alvaro Noboa?

28

> Q.    Yes.

(A.630-31).

Aguirre testified further:

> Q.    As president of Pacific Fruit, can you think of any business reason for the cessation of business in April 2011?
>
> A.    No.
>
> Q.    Can you think of any reason for advancing all of its cash to a dormant company in 2011?
>
> A.    No.
>
> Q.    As president, did you ever protest either the closing of Pacific Fruit's business or its advancing of all of its cash?
>
> A.    No.
>
> Q.    And you've never received or seen any written instructions concerning either of those two issues?
>
> A.    That is correct.
>
> Q.    And you've received no instructions from the shareholders of Pacific Fruit concerning any of that?
>
> Q.    And you received no direct instructions from anyone or any entity concerning either the cessation of business of Pacific Fruit in 2011 or the transfer of all its cash assets; is that correct?
>
> A.    That is correct.

(A.629).

Additional testimony was also provided by Mr. Arocho, who had left his position as Fruit Importers' Comptroller and Accounting Department Head after his prior deposition.

> Q.    Did you ever sign your deposition?
>
> A.    I did not sign my deposition.
>
> Q.    Did you ever discuss not signing your deposition with anyone at Pacific Fruit?
>
> A.    Yes, I did.
>
> Q.    And what were those conversations or conversation like?
>
> A.    Once I received my deposition, read it, didn't feel comfortable with it, I approached Ed and Carlos together and I told them there is no way I'm going to sign this. They said just sign it, it doesn't mean anything. There will be no – no course of action against you. You're just following orders from what we told you to do. And the deposition sat on my desk for over four months until I departed the company.
>
> Q.    Did you resign, or were you fired?
>
> A.    I had left the company abruptly. I returned a month-and-a-half later and worked out a deal with Ed Hickey and Carlos Aguirre and I was subsequently laid off.
>
> Q.    What was the deal you worked out?

> A.    I want – I didn't want to return. I told them I wasn't comfortable. It was almost a madhouse in that office and I wanted to leave. So they –
>
> Q.    Why were you not comfortable?
>
> A.    Well, I wasn't comfortable with the whole Pacific Fruit issue and they had other situations, IRS situations that were coming down the pipe that I didn't feel comfortable with.
>
> Q.    When you say the Pacific Fruit issue, what exactly do you mean?
>
> A.    The LauritzenCool case and the closing down of Pacific Fruit.
>
> Q.    LauritzenCool is another name for NYKCool?
>
> A.    That is correct. And the moving of assets and such.

(A.645-46).

To the extent the Court needs any further convincing as to the true motivation for the transfer Pacific Fruit's assets and operations among the alter-ego companies, including EL, Mr. Arocho provided even more forthcoming testimony concerning these events.

> Q.    Did it strike you as odd that Pacific Fruit was transferring funds into Pan American Trading?
>
> A.    Yes, it did and I immediately questioned it.

31

Q.     What were you told?

A.     I was told that there was a judgment that came down that was a lot of million – a few million dollars and we wanted to move the funds out of Pacific Fruit to protect the assets until they could resolve the matter with the judgment.

Q.     Did they say who the judgment was held by?

A.     Yes.

Q.     Who was that?

A.     NYKCool.

Q.     And did you transfer monies from Pacific Fruit to Pan American Trading?

A.     On an almost daily basis.

Q.     And are those transfers reflected in the general ledger for Pacific Fruit?

A.     Yes, they are.

Q.     Did you have further conversations with Hickey or anyone else at Pacific Fruit concerning those activities?

A.     I questioned Carlos Aguirre as well.

Q.     And what did Mr. Aguirre have to say?

A.     He informed me that this is what Ecuador wants to do and they want to proceed to close down Pacific Fruit and open a new company to run the banana portion of the business.

32

> Q.     Did he say why they wanted to do that?
>
> A.     He also stated it was because of the judgment that was pending and ownership, Alvaro Noboa, did not want to pay the judgment.

(A.42-43; <u>see also</u>, A.644 ("Q. And did you say or ask why that transition was taking place? A. I did. Q. And what were you told? A. Mr. Alvaro Noboa refuses to pay the judgment and he wants Pacific Fruit to go away . . . Q. Who told you about Mr. Noboa not wanting the judgment and regarding Pacific – A. Mr. Ed Hickey and Carlos Aguirre on separate occasions.")).

Moreover, a mere taste of the vast extent to which all of the indicia of <u>alter-ego</u> status recognized by the courts have been documented in this case may be found in the accountings prepared by NYKCool's expert. (A.654; A.788). Remarkably, the best response the defendants could muster is an opinion stating that no facial inconsistencies could be found in the defendants' ledgers, with all monies being accounted for and explained, <u>albeit</u> off the record, to defendants' expert by the defendants. (A.688). But, of course, there has never been a dispute that the defendants' accountants "balanced the books." It is the lack of a legitimate, arms-length business purpose for the transfers which is pertinent to the analysis, not a superficial and completely irrelevant analysis of whether the sums add up.

The explanation offered by Mr. Arocho for the transfers makes clear the stripping of assets from Pacific Fruit and transfer of them to related companies, including EL, which did not labor under an unsatisfied award or judgment was intentional and designed to avoid satisfying the judgment in the related action. As described above, the President of the concerned companies, Aguirre, claimed complete ignorance of any reason for the concerted and admitted efforts to render Pacific Fruit without assets. (A.647-50). But he did not dispute that that was what happened to Pacific Fruit and its assets soon after the award was rendered. Hickey, the Treasurer of all the concerned companies originally claimed ignorance of any reason for the transfers at issue. More recently he explained that the transfer of all assets of Pacific Fruit to associated companies, including EL, was driven, in some cryptic manner, by efforts to try to "settle" the award and judgment held by NYKCool.

Hickey and Aguirre are the only persons identified as having knowledge about the facts of the instant litigation in the Rule 26 Statement of the answering defendants, including EL. (A.698).

It should further be noted that Hickey, the person charged with overseeing electronic discovery collection among the defendant companies, including EL, also admitted that a computer server maintained in the New Jersey offices, which

34

was used by all the concerned answering defendant companies, including EL, was moved well after this litigation had commenced. First it was sent to "their Miami office" and then to an off-site location. (A.597). Although he was the person charged with collecting electronic discovery, Hickey was uncertain about what information was on the server which was moved and then apparently cannibalized. Id. The server was not preserved in situs. Similarly, Hickey testified that he helped destroy hard drives pulled from PCs in the "beginning of 2012 the end of 2011." (A.598). At least as early as December 15, 2011, NYKCool requested formal amendment of the judgment against Pacific Fruit to include the present corporate defendants, including EL. Those drives were destroyed, even though Hickey did not know the range of dates covered by the hard drives or what information they may have actually contained. Id.

Even so, as documented in the Kroll Report, the defendants' testimony still confirmed, inter alia, that, in fact, "advances were made between Fruit Importers and Ecuadorian Lines," the same officers ""transferred cash from one entity to another entity when the other entity needed funds in order to be able to satisfy their operational needs," "14 transactions in 2011 with the description 'PF to EL' in the sum of approximately $1.6 million" were identified without "any support to suggest a proper business purpose," "Fruit Importers pays Ecuadorian Line Fees that

reimburse them for expenses they have paid on Fruit Importers behalf for anything having to do with the bananas," "Fruit Importers has the same arrangement that Pacific Fruit had with Ecuadorian Line to pay port expenses on behalf of the company," Pacific Fruit's cash receipts of "$20,771,068 (99.83) was disbursed to three entities" including EL, Pacific Fruit's receivables from EL followed the same pattern as the others with "an increase of $1.8 million and a decrease of $1.6 million," "Pacific Fruit disbursed cash to Pan American, Pacific International and Ecuadorian Line and recognized the other side of this as amounts receivable during the period," and Kroll was "unable to identify invoices for any" of the transactions made available for review. (A.788).

Accordingly, based on the totality of the evidence, all of which was largely conceded by the defendants' witnesses, summary judgment against the corporate defendants including EL was, upon an unquestionably thorough report, readily recommended and then adopted by the district court, though, notably, only EL has appealed. (A.958). [1]

---

[1] It must be said that the corporate veil-piercing finding against the other defendants is more-than-likely not being contested, because still further efforts to undermine the Court's judgment by moving profit-making to other entities were undertaken yet again, and proceedings relative to those machinations continue in the district court. It would no doubt pose more difficulties to render EL judgment-proof, inasmuch as EL has a well-established trade name and owns or controls ships, i.e. attachable assets, regularly calling at the port of New York with Mr. Noboa's Bonita bananas.

# SUMMARY OF ARGUMENT

The evidence presented to the district court on EL's integral role as one of the Noboa-controlled alter-ego companies intimately involved in shifting the Bonita business operations so as to avoid judgment was truly overwhelming. Indeed, the complete domination and control of the defendant companies for no legitimate business purpose, the near-total overlap of ownership and management and contact details, the commingling of funds, the absence of corporate formalities, and the specific and collusive intent to undermine the district court's orders through fraudulent transfers were actually admitted by EL's witnesses. Such proof is rarely made available, rendering it difficult to imagine virtually any set of circumstances which might better justify entry of summary judgment. EL has asserted no specific misstatement by the district court in the law or facts. Rather EL argues on a selective, and at times erroneous, recapitulation of the record, that summary judgment was simply not supported as against EL. The entirety of EL's argument is, therefore, readily belied by even a cursory examination of that record.

## STANDARD OF REVIEW

Issues of law are subject to de novo review, while the "'clearly erroneous' standard of review controls our consideration of the factual findings of the district court even though based upon a documentary record." U.S. Titan, Inc. v. Guangzhou Zhen Hia Shipping Co., 241 F.3d 135, 145-46 (2d Cir. 2001) ("We are not permitted to find the district court's findings of fact to be clearly erroneous if the findings are one of two permissible views of the evidence.") (citing Anderson v. City of Bessemer City, North Carolina, 470 U.S. 564, 574, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)).

"As courts in this Circuit have consistently held for more than two decades, '[f]ederal courts sitting in admiralty must apply federal common law when examining corporate identity." Clipper Wonslid Tankers Holding A/S v. Biodiesel Ventures, LLC, No. 09 Civ. 9092 (RJS), 2012 WL 523541, *3 (S.D.N.Y. Feb. 12. 2012) (compiling cases); see also id. at *3 ("[I]t is undisputed that the charter party at the heart of the dispute was a maritime contract. The fact that Plaintiffs asserted claims against Fulcrum as an alter ego of Biodiesel does nothing to undermine that fact or vitiate the Court's maritime jurisdiction in this action.") (compiling cases); United States v. Afram Lines (International), Inc., No. 91 Civ. 1062, 1997 WL 423063 (S.D.N.Y. Jul. 28, 1997).

And summary judgment is appropriate, if the record shows, "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). If the moving party shows an absence of evidence to support the non-moving party's case in this regard, the non-moving party then bears the burden to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 323-25, 106 S. Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). Evidence that is merely colorable or not sufficiently probative will not defeat an otherwise proper motion for summary judgment. Anderson, 477 U.S. at 249.

## ARGUMENT

**POINT I.          THE JUDGMENT BELOW WAS EASILY WARRANTED ON BOTH THE FACTS AND LAW.**

Though the Court is mainly just supposed to pierce the corporate veil "whenever necessary to prevent fraud or achieve equity," the factors to be considered in determining whether there has been sufficient corporate domination and control are oft-cited and well-known. See, generally, Wm. Passalcqua Builders, Inc. v. Resnick Dev's S., Inc., 933 F.2d 131, 139 (2d Cir. 1991) ("(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.,* issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by

other of the corporations as if it were its own.") (compiling cases) ."); see also,

Daval Steel Prod's v. M/ Fakredine, 951 F.2d 1357 (2d Cir. 1991) (In amending

judgment to include alleged corporate alter-ego, "the district court justifiably

entered an order taking as established the claim whose proper adjudication Ekco

deliberately endeavored to frustrate, and precluding Ekco from offering contrary

evidence."); Hawknet Ltd. V. Overseas Shipping Agencies, No. 07 Civ. 5912

(NRB), 2008 U.S. Dist. LEXIS 35542, **14-16 (S.D.N.Y. Apr. 29, 2008)

("[P]laintiff alleges that the wire transfer was made on behalf of TOM 'c/o MOS

Overseas shipping . . . which shows a lack of corporate separateness'") (quoting

Brave Bulk Transp. Ltd. v. Spot On Shipping Ltd., No. 07 Civ. 4546 (CM), 2007

U.S. Dist. LEXIS 81137, 2007 WL 3255823, *6 (S.D.N.Y. Oct. 30, 2007)); Wajilam

Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd., 475 F. Supp. 2d 275, 284-85

(S.D.N.Y. 2006) ("The allegation that ATL-BVI and ATL-Shanghai encouraged

third parties to pay debts owed by them directly to Via Sistina is highly relevant to a

veil-piercing theory, because it implicates a number of these factors, including

disregard of corporate formalities, intermingling of funds, transactions not at arm's

length, and failure to treat the corporations as independent profit centers."); Ullises

Shipping Corp. v. FAL Shipping Co., 415 F. Supp. 2d 318, 2006 A.M.C. 1094

(S.D.N.Y. 2006) ("Ullises presents enough evidence to satisfy its burden with

41

respect to FAL Oil.  FAL Oil paid FAL Shipping's debts under the agreement with Ullises from FAL Oil accounts.").

"Meanwhile, the fraud, injustice, or unfairness requirement under federal law was clarified in *Lutyk*, in which the Third Circuit held that no **actual** fraud is required to pierce the corporate veil, merely an **element** of injustice or fundamental unfairness." Blair v. Infineon Technologies AG, 720 F. Supp. 2d 462, 471 (D. Del. 2010) (citing Trustees of the Nat'l Elevator Indus. Pension v. Lutyk, 332 F.3d 188, 194 (3d Cir. 2003) (emphasis in original); see also, JSC Foreign Economic Ass'n Technostroyoexport v. International Dev. and Trade Serv's, Inc., 386 F. Supp. 2d 461, 475-76 (S.D.N.Y. 2005) ("Because Reich and Jossem have provided no evidence contradicting the evidence submitted by the plaintiff, there is no material issue of fact with regard to whether Reich and Jossem dominated and controlled IDTS for the purposes of piercing the corporate veil . . . [T]he diversion of funds to make a corporation judgment-proof constitutes a wrong for the purposes of determining whether the corporate veil should be pierced.") (compiling cases); Godwin Realty Assoc's v. CATV Enter's, Inc., 275 A.D.2d 269, 712 N.Y.S.2d 39 (1st Dep't 2000) (Under New York law, "[t]he stripping of corporate assets by shareholders to render the corporation judgment proof constitutes a fraud or wrong justifying piercing the corporate veil.") (citing Holborn Oil Trading Ltd. v.

42

Interpetrol Bermuda Ltd., 774 F. Supp. 840, 847 (S.D.N.Y. 1991) (decided under the federal common law of admiralty)).

The really remarkable aspect of the case at bar is the extent to which each and every one of the indicia of corporate domination and control have been so obviously and readily confirmed as a matter of record.[2] See, generally, Counter-Statement of Facts supra. The testimony of defendants admitted that (1) no corporate meetings or records thereof were kept; (2) assets were emptied from some defendant companies to others which had never had any; (3) the transfers were not explained by any legitimate business purpose, but rather upon the personal desire of the owner to avoid paying the judgment in the underlying action; (4) the defendant companies had complete overlap in directors and ownership; (5) they shared the same offices; (6) no independent discretion was exercised, as, indeed, no legitimate rationale could even be articulated for the transfer of assets and operations from one to another company at will; (7) the lack of arms-length dealing was repeatedly conceded; (8) there was no independence at all, with profits being admittedly siphoned off from one to another; (9) debts were

---

[2] Still further support may be found in the defendants' spoliation of any further evidence in this regard. See, generally, A.47; see also, PSG Poker, LLC v. De Rosa-Grund, No. 06 Civ. 1104 (DLC), 2008 WL 190055, **11-12 (S.D.N.Y. Jun. 22, 2008) (adverse inference granted due to spoliation); Kyoei Fire & Marine Ins. Co. v. M/V Maritime Antalya, 248 F.R.D. 126, 145 (S.D.N.Y. 2007) (adverse

routinely paid by one another without consideration; and (10) all of the corporations' property was, again admittedly, treated interchangeably, without explanation and with only an accounting ledger to keep track of the flow. Id.; see also, Hannah Bros. v. OSK Marketing & Communications, Inc., 609 F. Supp. 2d 343 (S.D.N.Y. 2009)(noting that the alleged alter-egos "'have been represented by the same counsel and have answered as one voice,' [which] might, in appropriate circumstances, indicate a disregard for the corporate form supporting 'alter ego' liability.") (citations omitted).

EL's main argument below, through their expert, that no "commingling" occurred because, technically, separate bank accounts were created and maintained and transactions accounted for each entity stretches credulity on its face. Evidence that the alter-egos paid or received one another's debts have been repeatedly held to support claims of corporate veil-piercing, regardless of whether each formally maintained separate bank accounts and kept records of the transfers. See, e.g., SPL Shipping Ltd. v. Gujarat Chemise Ltd., No. 06 Civ. 15375 (KMK), 2007 U.S. Dist. LEXIS 18562, *11 (S.D.N.Y. Mar. 15, 2007); World Reach Shipping Ltd. v. Industrial Carriers Inc., No. 06 Civ. 3756 (NRB), 2006 U.S. Dist. LEXIS 83224, *11 (S.D.N.Y. Nov. 9, 2006); Tide Line, Inc. v. Estrada Commodities, Inc., No. 06

---

inference granted due to spoliation).

44

Civ. 1979 (KMW), 2006 U.S. Dist. LEXIS 95870, 2007 A.M.C. 252 (S.D.N.Y. Aug. 15, 2006)); see also, United States v. Nirenberg, 772 F. Supp. 120 (E.D.N.Y. 1991).

And, of course, the wrong visited upon NYKCool by virtue of Pacific Fruit being rendered unable to satisfy the judgment in the underlying action is beyond dispute. Id.

Indeed, a court is rarely presented with such overwhelming, undisputed evidence of alter-ego gamesmanship. There was simply no impediment to summary judgment on these facts. The papers submitted in opposition to NYKCool's motion are quite remarkably brazen. Mess'rs Hickey and Quinn essentially aver that proper accounts were kept. They assert funds were not "commingled," corporate separateness was maintained, and the sister companies' assets were not, in fact, treated as a personal pool for Alvaro Noboa and each other, all on the basis of an ex post facto log created to generally characterize the transfers as "advances," "debts," "receivables," and/or otherwise.[3] Regardless of how the movement of funds was dubbed, the fact remains that the defendants were paying one another's debts without consideration, and then styling those very payments as the purported

---

[3] Again, as described in Kroll's previous report, actual, contemporaneous "invoices" have never been produced. Nor has EL addressed the spoliation of additional electronic evidence raised in NYKCool motion papers.

45

"consideration," itself, all, in short, derived from thin air. It is a farcical, near-risible position and an obvious fraud. Giving cognizance to such a fallacy would effectively prevent any plaintiff from ever establishing this aspect of an alter-ego claim.

For this purpose, the defendants further refer to each other, whenever convenient, as "vendors" or "contractors."   They ignore that all of these so-called credits and debts shifted between companies, run by the same officers, located in the same offices, and owned by the same person, who also owns the "Bonita" brand. Pacific Fruit's business entailed the exclusive rights to that product in North America, and that entire business was transferred "lock, stock, and barrel," with EL's essential role in shipping the product remaining unaltered, as repeatedly admitted, due solely to the judgment against Pacific Fruit. A disinterested contractor or vendor would, of course, clearly not have had a care whether Pacific Fruit's profits went to satisfy that judgment or not. An alter-ego clearly would. But, again, all material facts in this regard, including the motivation behind the business transfer, have been conceded on the record.

Moreover, it is a well-settled rule in this Circuit that a party may not create a material issue of fact so as to defeat summary judgment by submitting an affidavit contradicting his own prior deposition testimony.  Margo v. Weiss, 213 F.3d 55,

60 (2d Cir. 2000); <u>Perma Research & Dev. Co. v. Singer</u>, 410 F.2d 572, 578 (2d Cir. 1969). The above notwithstanding, that a trained accountant, who had the benefit of counsel through two depositions, claims to not have known what was meant when he was asked whether funds had been "commingled," speaks volumes about the extent to which these defendants have been willing to flout the law and the judgment of the Court. That the best another accountant (specifically retained as an "expert") can say about the factors to be weighed in assessing alter-ego liability is that the books add up correctly, speaks still further volumes (no pun intended).

The ample, targeted case law on the particular points raised, remains completely undistinguished by defendants in any way. Rather, the defendants' Memoranda of Law have always merely cited a line or two of simplistic boilerplate for the alter-ego factors, followed in each event by an entirely conclusory statement positing that the claim has not been demonstrated or that sufficient evidence has not been presented. That process continues in the instant appeal, with EL essentially insisting that the district court erred by discussing all of the alter-ego's relationships together, without affording EL proper respect by referring to it by name enough. With respect to those instance where the R&R spoke of conduct concerning the group of companies together, EL cannot point to

47

a single actual inaccuracy. Nonetheless, EL argues that, had the district court really given full consideration to EL's role, in its own right, the evidence would somehow be lacking.

The Court was issuing decisions on a summary judgment motion and was thus under no obligation to service EL's ex post facto demand for insatiably detailed findings and recitations of thousands of pages of record evidence with particular reference to EL ad nauseum, and the entirety of the evidentiary record developed below is properly before this Court for review, in any event. Fed. R. Civ. P. 52(a)(3); Prudential Ins. Co. of Am. V. Goldstein, 43 F. Supp. 767 (E.D.N.Y. 1942).

But the district court's reasoning has, in fact, been made abundantly clear. NYKCool's papers, as well as the district court's decisions laid out in excruciating detail not only the overwhelming supporting evidence, but bold admissions by the defendants on each element of each claim asserted by NYKCool. An obvious pattern of conduct involving all the Noboa entities, including EL, in a collusive scheme to defraud NYKCool of its judgment is altogether apparent from the record. Accordingly, the defendants' own testimony referred to all of the entities together, as much of the evidence was the same as to all together. So surely there is no error to be found in the district court often identifying them collectively,

48

when the facts applied collectively.

The defense was and remains just empty. These defendants have basically shown themselves willing to "throw themselves on their swords" for Alvaro Noboa, and there is surely nothing in the facts or the law which should incline the Court to now stand in their way.

Firstly, EL conceded that the R&R applied the correct legal standard in articulating a list of indicia to be considered by the Court in determining whether corporate veil piercing should be directed. And EL appeared to also concede that many of these indicia, such as lack of corporate formalities, overlapping ownership and personnel, common offices space and telephone numbers, were established as against EL. But as the case law (much of it cited by the R&R) has taken pains to emphasize, those factors are just analytical aids. They are not, and were never intended to be, exhaustive. Nor should it be necessary to find each and every one satisfied in order to support the alter-ego finding. Each case is different, and the overall record is to be assessed on the equities of its individual facts, rather than through the prism of an overly rigid or technical application of any particular checklist. At bottom, a claim seeking to pierce the corporate veil of companies is aimed at the equitable powers and conscience of the court. "We are inclined to agree . . . What the formula comes to, once shorn of verbiage about control,

instrumentality, agency and corporate entity, is that liability is imposed to reach an equitable result." <u>Brunswick Corp. v. Waxman,</u> 599 F.2d 34, 36 (2d Cir. 1979). Nonetheless, EL seems to focus mainly on the alleged lack of evidence of funds transfers involving EL. There is, of course, more than enough evidence to support the R&R's conclusions as against EL, even assuming <u>arguendo</u> such evidence was lacking.

But, secondly, no such assumption need or should be made here, because the evidence presented of unjustified or wrongful asset transfers involving EL was plentiful and largely admitted by the defense witnesses, EL's grossly selective and misleading papers notwithstanding. It is itself conclusory to allege that the district court's judgment and order and the R&R upon which they were based were not suitably meticulous in addressing each defendant's role in the admitted scheme to defraud NYKCool and avoid judgment. Nor should any judge be under any obligation to recite each and every fact and bit of testimony in a record thousands of pages long. But, if the R&R's own thorough treatment of the facts were somehow to be deemed insufficient in this regard, the Court need only look to the record itself, or even the Updated Expert Report prepared by Kroll Associates, Inc., alone. (A.788).

50

With pinpoint citations to the deposition transcripts and other record documents, that Report outlines how all of the companies targeted by the motion, including EL, were owned by the same holding company, share the same officers and office space, had directors confused about whom they work for, had employees confused about which companies they worked for, did not follow corporate formalities, and even shared the same attorneys for all purposes, including the instant litigation. Id.

It is worth noting that no objection to its status as a "sham" corporation is made by Pacific Group Holding, Inc., the very company that "holds" all of EL's stock, and in which the same officers and directors sit. Equally, no objection was made to the R&R's finding that all the sister companies are shell/alter-ego companies. Those "sham" companies also share the same directors and officers with EL. It would take a very wide "Chinese Wall" to insulate one company of a "holding group" from the noxious acts of all the others, particularly when directed by the same Board of Directors and officers. Here the proposition is absurd, as EL was deeply involved in the Holding Group's coordinated efforts. Edward Hickey was fully EL's Treasurer, when he admitted he acted to strip Pacific Fruit of all assets in order to thwart the Plaintiff from collecting its judgment. No reservation was made that when he acted for EL he only acted legitimately with respect to that endeavor.

51

Likewise, he was EL's treasurer when he conceded funds are commingled among the companies based upon need. EL was not carved out of those admissions, or those of his fellow workers, Carlos Aguirre, Gina Santoro, and Manual Arocho, when each testified to the actions that were the basis of the R&R. Moreover, even if all of the money siphoned off Pacific Fruit and provided EL was used only to satisfy Pacific Fruit's debts, the very act of handing off Pacific Fruit's assets to EL was an act designed to hide Pacific Fruit's money lest it be found by the plaintiff. But, of course, all the money transferred from Pacific Fruit to EL was not used to pay legitimate debts of Pacific Fruit.

And, again, the Kroll Report also documented testimony confirming, inter alia, that, in fact, "advances were made between Fruit Importers and Ecuadorian Lines," the same officers ""transferred cash from one entity to another entity when the other entity needed funds in order to be able to satisfy their operational needs," "14 transactions in 2011 with the description 'PF to EL' in the sum of approximately $1.6 million" were identified without "any support to suggest a proper business purpose," "Fruit Importers pays Ecuadorian Line Fees that reimburse them for expenses they have paid on Fruit Importers behalf for anything having to do with the bananas," "Fruit Importers has the same arrangement that Pacific Fruit had with Ecuadorian Line to pay port expenses on behalf of the

company," Pacific Fruit's cash receipts of "$20,771,068 (99.83) was disbursed to three entities" including EL, Pacific Fruit's receivables from EL followed the same pattern as the others with "an increase of $1.8 million and a decrease of $1.6 million," "Pacific Fruit disbursed cash to Pan American, Pacific International and Ecuadorian Line and recognized the other side of this as amounts receivable during the period," and Kroll was "unable to identify invoices for any" of the transactions made available for review. EL's briefing continues to turn a "Nelson's eye" to all of this abundant evidence of EL's direct involvement.

Rather, EL seems to continue to rely for its defense on the statement by its expert accountant that the books were "balanced," inasmuch as the movement of funds was documented. This rather sorry argument always has been, and remains, particularly perplexing. It might suffice to avoid an Internal Revenue Audit, for instance, but it says nothing at all about whether an alter-ego relationship existed with effective commingling of funds. It only facilitates the analysis by at least providing some, at least facial, record or recapitulation of that very commingling. Indeed, though some transactions surely may have been legitimate, EL's payments and receipts to and from the other defendant companies were candidly often described as advances or payments on behalf of one or the other sister company. Moreover, as the defendants' witnesses admitted again and again, there was

typically no consideration at all, much of the transfers being designed to avoid enforcement of the Court's Judgment.

EL's critique of the district court's holdings is thus based on a myopic view of the facts and law worthy of Procrustes and wholly at odds with the record. Its entire position is little more than a canard and should be rejected out of hand.

**CONCLUSION.**

WHEREFORE, NYKCool urges the Court to affirm the district court's order and grant to NYKCool such other and further relief as this Honorable Court may deem just and proper.

Dated:    New York, New York
          December 19, 2013

                    Respectfully submitted,

                    MAHONEY & KEANE, LLP
                    Attorneys for Plaintiff-Appellee
                    NYKCOOL A.B.


          By:   /S/_____
                    Garth S. Wolfson / Edward A. Keane
                    40 Worth Street, 10th Floor
                    New York, New York 10013
                    (212) 385-1422

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Garth S. Wolfson, do hereby certify that the foregoing brief contains 10,226 words in 14-Point Times New Roman format and, therefore, complies with Rule 32(a)(7)(B)(ii) of the Federal Rules of Appellate Procedure.


<u>/S/</u>_____
Garth S. Wolfson